UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
KAREN CULLIN,

                      Appellant,

   -against-

KENNETH P. SILVERMAN,
*Chapter 7 Trustee of Agape World, Inc.*,

                     Appellee.

----------------------------------------------------------------X

For Online Publication Only

**MEMORANDUM & ORDER**
14-CV-4248 (JMA)

A P P E A R A N C E S:

Karen Cullin
    *Pro se Appellant*

David Joseph Mahoney
SilvermanAcampora LLP
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
    *Attorneys for Appellee*

**AZRACK, United States District Judge:**

Appellant Karen Cullin appeals an order of the Bankruptcy Court (Grossman, J.) that awarded Trustee Kenneth P. Silverman $11,744.76 on his constructive fraudulent conveyance claim against Cullin. For the reasons set forth below, the Bankruptcy Court's order is AFFIRMED.

**I. BACKGROUND**

Cullin made investments totaling $75,000 in a Ponzi scheme perpetrated by Nicholas Cosmo and various companies he controlled, including Agape World, Inc. and other "Agape" entities. Cullin's investments were memorialized in contracts between her and Agape entities.

1

Before the scheme collapsed, Cullin received $86,744.76, leaving her with a net gain of $11,744.76 on her investments.

Beginning in 1999, Agape operated as a purported "bridge lender, whereby investors were advised that Agape provided short-term bridge loans to commercial borrowers in order to generate high rates of return." (Order Following Trial ("Order") ¶ 8, ECF No. 1-4.) Agape and various brokers recruited third-party investors, such as Cullin, to invest money with Agape. (Id. ¶ 9.) Pursuant to the contracts between the third-party investors and Agape, the "investors were permitted to receive payments from their purported investments in the form of 'interest payments' or, alternatively, the purported investors were permitted to 'roll-over' their investments to a future bridge loan offered."[1] (Id. ¶ 11.) However, "[t]he third-party funds received by [Agape] were not used to invest in bridge loans." (Id. ¶ 12.) Instead, funds from investors were "used to pay prior investors their promised rate of interest or to provide a return of their investment." (Id. ¶ 13.) In addition, Agape used investor funds to engage in "undisclosed and unauthorized commodity futures trading." (Id. ¶ 15.)

After various Agape entities entered bankruptcy, Silverman, the Trustee for those entities, filed an adversary proceeding against Cullin, alleging that some of the funds Cullin received from Agape constituted a fraudulent conveyance. After a bench trial, the Bankruptcy Court found that Cullin's $11,744.76 net gain constituted a fraudulent conveyance under New York law and awarded that amount to the Trustee. (Id. at 7.) This appeal followed.[2]

---

[1] The details of Cullin's contracts are discussed further infra.

[2] In the Bankruptcy Court, Cullin appeared *pro se* and represented herself during the bench trial. Cullin, however, admitted to the Bankruptcy Court that her attorney had prepared her pre-trial brief. (Trial Tr. ("Tr.") 4:14–18; 5:10–12, ECF No. 1-9.) On appeal, Cullin is again proceeding *pro se*. It appears, however, that her appellate papers were prepared by, or with the substantial assistance of, an attorney.

## II. DISCUSSION

### A. Standard of Review

Cullin challenges the Bankruptcy Court's legal conclusions, which this Court reviews *de novo*. In re Hyman, 502 F.3d 61, 65 (2d Cir. 2007). A bankruptcy court's factual findings are reviewed for clear error.[3] Id.

The harmless error rule applies in bankruptcy appeals. In re Sanshoe Worldwide Corp., 993 F.2d 300, 305 (2d Cir. 1993) (citing Federal Rule of Bankruptcy Procedure 9005).

### B. New York's Fraudulent Conveyance Statute

"The Bankruptcy Code provides two avenues for a trustee to recover fraudulent transfers made by the debtor." In re Carrozzella & Richardson, 286 B.R. 480, 483 n.3. (D. Conn. 2002). A trustee may seek relief directly under 11 U.S.C. § 548, the Bankruptcy Code's fraudulent conveyance provision. Alternatively, a trustee may invoke 11 U.S.C. § 544(b), which "permits a trustee to avoid any transfers that an unsecured creditor could avoid under applicable state law." In re Bernard L. Madoff Inv. Securities LLC, 773 F.3d 411, 41 (2d Cir. 2014), pet. for cert. filed (Mar. 17, 2015). Here, the applicable state law is New York Debtor & Creditor Law ("DCL") §§ 270–281. "With few exceptions, the basic principles governing fraudulent transfer actions are the same, regardless of [whether Section § 548 or state law is invoked.]" Carrozzella, 286 B.R. at 483 n.3 (citation omitted).

DCL § 273 provides that: "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair

---
[3] To the extent that the Supreme Court's decision in Stern v. Marshall, 564 U.S. 2 (2011), could potentially impact this appeal, the parties have waived any arguments under Stern by not raising them below or on appeal. See In re FKF 3, LLC, 501 B.R. 491, 499 (S.D.N.Y. 2013) (noting that parties who fail to object before the bankruptcy court or on appeal can be deemed "to have impliedly consented to final adjudication by the bankruptcy judge"), appeal filed (2d Cir. Dec. 5, 2013).

consideration." "Fair consideration is given for property, or obligation . . . [w]hen in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied . . . ." DCL § 272.

Similarly, Section 548 of the Bankruptcy Code requires, among other things, that the debtor "received less than a reasonably equivalent value" in the transfer. 11 U.S.C. § 548(a)(1)(B)(i). When analyzing claims under the DCL and the Bankruptcy Code, courts use the "[Bankruptcy Code's] 'reasonably equivalent value' [standard] interchangeably with the DCL's 'fair consideration' [requirement]." In re Singh, 434 B.R. 298, 309 (Bankr. E.D.N.Y. 2010).

To establish fair consideration, "neither 'mathematical precision' nor a 'penny-for-penny exchange' is required." In re Churchill Mortg. Inv. Corp., 256 B.R. 664, 678 (Bankr. S.D.N.Y. 2000) (quoting Rubin v. Mfrs. Hanover Trust Co., 661 F.2d 979, 994 (2d Cir. 1981)), aff'd sub nom. Balaber-Strauss v. Lawrence, 264 B.R. 303 (S.D.N.Y. 2001). "Rather, the assessment of fair equivalent value requires a court to compare the rough values of what was given and what was received in exchange." Chen v. New Trend Apparel, Inc., 8 F. Supp. 3d 406, 448–49 (S.D.N.Y. 2014) (Daniels, J., adopting report and recommendation of Dolinger, M.J.).

**C. Application of Fraudulent Conveyance Principles to Ponzi Schemes**

Although the Second Circuit has not addressed how the DCL applies to Ponzi scheme investors, many courts have concluded that such statutes allow those investors to retain their principal, but not any profits or interest. See, e.g., Donell v. Kowell, 533 F.3d 762, 777–78 (9th Cir. 2008); In re Bernard L. Madoff Inv. Sec. LLC, 454 B.R. 317, 333 (Bankr. S.D.N.Y. 2011), leave to appeal denied, No. 11-MISC-337, 2012 WL 5511952, at *3 (S.D.N.Y. Nov. 14, 2012). There is, however, a split of authority over the application of fraudulent conveyance principles to at least one subset of Ponzi schemes—those in which investors are paid contractual interest on

loans to the Ponzi scheme operator. Courts disagree whether such contractual interest can ever constitute reasonably equivalent value. See In re Carrozzella & Richardson, 286 B.R. 480, 487–90 (D. Conn. 2002) (surveying decisions).

One line of precedent—illustrated by cases such as In re Indep. Clearing House Co., 77 B.R. 843 (D. Utah 1987) and In re Taubman, 160 B.R. 964 (Bankr. S.D. Ohio 1993)—deny investors any recovery of interest. These cases reason that: (1) investors' contracts in Ponzi schemes are not enforceable as applied to interest and profits because such contracts contravene public policy; and (2) funds from Ponzi scheme investors do not provide "value" to the debtor and its creditors because such funds merely allow the debtor "to defraud more people of more money." In re Indep. Clearing House Co., 77 B.R. at 857–860; Taubman, 160 B.R. at 986–87; see also Janvey v. Golf Channel, Inc., No. 13-11305, 2015 WL 1058022 (5th Cir. Mar. 11, 2015) (adopting similar view of value and holding that, in context of Ponzi scheme, payment to trade creditor constituted a fraudulent transfer under Texas law)

In contrast, cases such as Carrozzella and In re Unified Commercial Capital, Inc. hold that payments to Ponzi scheme investors of reasonable contractual interest do not constitute fraudulent transfers because such payments satisfy antecedent debts and result in the debtor receiving reasonably equivalent value in exchange for the payments. See Carrozzella, 286 B.R. at 490–91 (applying Connecticut's Uniform Fraudulent Transfer Act and stressing that the annual interest rates paid to investors, which ranged from 8%–15%, were reasonable and that [t]his was not the typical 'too-good-to-be-true' investment scheme"); In re Unified Commercial Capital, Inc., 260 B.R. 343, 353 (Bankr. W.D.N.Y. 2001) aff'd No. 01-CV-6004, 2002 WL 32500567 (W.D.N.Y. June 21, 2002).

**D. The Arguments and Decision Below**

Below, Cullin argued that, under the Carrozzella line of precedent, she was entitled to keep the $11,744.76 in profits. The Bankruptcy Court disagreed and found those transfers to be constructively fraudulent under the DCL. (Order at 6.) The Bankruptcy Court did not explicitly address the split of authority concerning Ponzi schemes, but appeared to follow the Indep. Clearing House Co. line of cases, stating that: "[N]one of the arguments raised by [Cullin] are valid in the case of a Ponzi scheme such as we have here. Because none of the authorities cited by [Cullin] are applicable to the facts of this case, [her] defenses raised are overruled." (Id. at 7; see also Tr. 49:14–15 ("In a ponzi scheme, what the law says is, once you get more than [the principal you invested], everything else comes back.").

**E. The Parties' Arguments on Appeal**

On appeal, Cullin again relies on the Carrozzella line of precedent, arguing that the $11,744.76 was interest paid in the satisfaction of a legally enforceable antecedent debt, and thus constituted fair consideration. The Trustee urges the Court to follow the opposing line of precedent, which forecloses Cullin's claim to the $11,744.76. In the alternative, the Trustee argues that Cullin cannot recover under Carrozzella because the record on appeal does not contain Cullin's contracts with Agape. The Trustee also implies that those contracts were never made part of the record below. The Trustee does not address the substance of Cullin's contracts. Instead, the Trustee attempts to "reserve[] all of his rights, claims, remedies, defenses, and rebuttals in the event that [Cullin], or any other defendant in connection with the Agape bankruptcy case, introduces executed contracts for the purpose of proving a contractual right to

6

'interest' payments over and above their principal investments."[4] (Appellee Br. at 7, ECF No. 5.) In response, Cullin appended the contracts to her reply brief and argues that, even if the Court declines to consider the actual contracts, various admissions by the Trustee below are sufficient to allow Cullin to prevail under Carrozzella.

**F. Analysis**

It is unnecessary to decide which competing line of precedent is more persuasive because, even under Carrozzella and related cases, the $11,744.76 still constitutes a fraudulent conveyance and, therefore, Cullin is not entitled to those funds.[5] Accordingly, the Bankruptcy Court's decision is affirmed.

**1. Cullin's Contracts Are Not Part of the Record**

Cullin did not designate her contracts as part of the record on appeal. More importantly, as far as the Court can determine, Cullin's contracts were never formally introduced into the record before the Bankruptcy Court.[6] In any event, as explained below, irrespective of whether or not her contracts are part of the record, Cullin cannot prevail.

---

[4] Below, the Trustee argued, *inter alia*, that "Agape was a classic 'too-good-to-be-true' scheme since many [of Agape's contracts] offered . . . at least a 48% return on [Cullin's] 'investment' on an annualized basis." (Trustee's Pre-Trial Mem. at 8 n.5, ECF No. 1-2.)

[5] The question of which competing strand of precedent this Court should follow is a question of law. If this Court were to follow the Carrozzella line of the precedent, certain subsidiary questions of fact under that precedent would arise, including whether the interest rates under Cullin's contracts were reasonable. The Bankruptcy Court did not make explicit findings on these questions. However, any error in this regard would be harmless. As explained infra, even when the record below is viewed in the light most favorable to Cullin and all reasonable inferences are drawn in her favor, no reasonable factfinder could find for Cullin on the relevant factual questions. Accordingly, even under Carrozzella, the Bankruptcy Court's decision may be affirmed without the necessity for a remand and further fact-finding. See In re Sanshoe Worldwide Corp., 993 F.2d 300, 305 (2d Cir. 1993) (holding that although bankruptcy court failed to make necessary findings, record established that this failure was harmless error); Stevens v. Baas, 197 B.R. 57, 59 (N.D. Ohio 1995) (holding that bankruptcy court's failure to address appellant's defense was harmless because it was "evident from the record" that defense failed).

[6] Cullin's initial disclosures, which contained two of her contracts, were filed on the docket below. The Court, however, fails to see how such a filing is sufficient to make them part of the record for purposes of this appeal. The Court also notes that Cullin—who appeared *pro se* at the bench trial—appears to have introduced certain exhibits that the Bankruptcy Court accepted into evidence. (Tr. 46:17–21.) However, the content of Cullin's exhibits is not identified in the trial transcript or anywhere else in the record.

7

### 2. The Trustee's Admissions Below

Cullin suggests that even if her contracts are not formally part of the record, various concessions by the Trustee below are sufficient to allow her recover under Carrozzella. Cullin is mistaken.

Below, the Trustee represented that the contracts Agape offered to investors "permitted [them] to receive payments from their purported investments in the form of 'interest payments.'" (Trustee's Pre-Trial Mem. at 3.) The Trustee also stated that Cullin "purportedly received 'interest' payments allegedly arising out of her 'investment.'" (Id. at 4.) The mere fact that unspecified contracts existed and that certain payments were in the form of quote-unquote "interest payments" does not establish that these payments were made pursuant to a valid antecedent debt or constituted fair consideration. Moreover, Cullin ignores the fact that the Trustee also represented below that Agape's contracts involved annual interest rates of 48%. (Id. at 8 n.5.) As explained infra, such interest rates are unreasonable under Carrozzella.

### 3. Cullin's Contracts

Cullin also urges the Court to consider the contracts themselves, which she attached to her reply brief. Even if those contracts could be considered, Cullin still cannot prevail under Carrozzella.

Cullin submitted four contracts. The first two are largely identical. They refer to Cullin's investment as a "loan," but also contain the following critical provisions:

- "Dividends And/Or Interest Payments Are 'Not Guaranteed' by [Agape]."

- "Upon Closing Client Will Receive 'Up To' (14.0%) Percent Interest Check Based on Principal."[7]

---

[7] This contract, and two others, state that they apply to short-time investments spanning approximately 60 to 70 days. The fourth contract does not state the length of the investment, but makes clear that the return was up to 4% per month.

The third contract is slightly different, but also includes the following relevant provisions:

- "Interest payments are 'not guaranteed' by [Agape]."

- "Upon closing client will earn 'up to' twelve percent (12%) interest based on principal."

The fourth contract, between Cullin and a different Agape entity, is more detailed and contains the following provisions:

- "Lender hereby sells to the Participant and the Participant hereby purchases from the Lender a participation in the advance. [Agape] sells participation up to a 48% or 4% per month discount per annum for 24 month term"

- "No advances or repayments of advances are guaranteed by [Agape] or any of its affiliates or business partners."

- "Lender agrees to keep accurate records of all participants [sic] advances, collateral material, and collections."

- "Advance payments are 'Not Guaranteed' by [Agape]."

The fourth contract also includes the following question: "Do you wish to receive your potential monthly return of up to 4%[?]"

The details of Cullin's contracts doom her arguments under Carrozzella for two reasons. First, the contractual rate of return on Cullin's contracts—approximately 48% or more annually—is not reasonable under Carrozzella. See In re Canyon Sys. Corp., 343 B.R. 615, 643–46 (Bankr. S.D. Ohio 2006) (granting summary judgment to trustee and distinguishing Carrozzella where Ponzi scheme provided returns of 35% or more, which resulted in debtor not receiving reasonably equivalent value in exchange for transfers). Cullin's rates of return are prima facie evidence of unreasonableness and Cullin did not offer any evidence to the contrary.[8] Cf. Carrozzella, 286 B.R. at 484 n.3 (explaining that, although "many Ponzi schemes

---

[8] Below, Cullin sought to introduce evidence concerning the one-day return generated by Twitter's initial public offering ("IPO"). (Tr. 47:16–48:1.) The Bankruptcy Court refused to accept this evidence as an exhibit. (Tr. 47:16–48:1.) Cullin does not challenge that decision and, in any event, evidence regarding investors' return on an IPO is not relevant to the question of what constitutes a reasonable rate of return on a loan.

9

characteristically use exorbitantly high rates of return to entice new investors," annual interest rate of 15% was not unreasonably high given that when scheme began, the prime rate of interest was over 15%).

Second, unlike the contracts in Carrozzella and Unified Commercial Capital, Cullin's contracts make clear that Agape did not guarantee a specific rate of interest, or, in fact, any interest at all. Compare Contracts, Exs. to Appellant's Reply Br., ECF No. 7 with Carrozzella, 286 B.R. at 484 & nn.9–14 (stating that that each investor was promised a specific rate of return); Unified Commercial Capital, 2002 WL 32500567, at *8 ("[Debtor] represented that it was selling 'debentures' and 'certificates of deposit' to investors with 'guaranteed' returns of twelve percent or more annually. Thus, the payments to [the investor] were not simply payments of nonexistent profits, but of a contractually provided-for, commercially reasonable rate of interest on what amounted to a loan by [the investor] to [debtor].")[9]; see also In re Bayou Grp., LLC, 439 B.R. 284, 337 (S.D.N.Y. 2010) (distinguishing Carrozzella and Unified Commercial Capital because "they involved commercially reasonable, contractually guaranteed rates of return" and "explicit promise[s] of a repayment greater than principal"). At best, Cullin's contracts could be considered contingent obligations that required Agape to pay Cullin some (or all) of the interest that Agape received from the entities that entered into bridge loans with Agape.[10] The problem for Cullin is that, because Agape never made these bridge loans, it never

---

[9] In Unified Commercial Capital, the investor's account agreement guaranteed a 12% return, but certain other documents provided to the investors indicated that investors were not entitled to any return unless the debtor was, in fact, profitable. 2002 WL 32500567, at *8 n.4. The district court dismissed the relevance of this point, which was apparently raised for the first time in a reply brief, noting that "[t]he fact remains, however, that [the debtor] receive[d] value from [the investor] in the form of a $100,000 loan, and that [the investor] was entitled to reasonable interest on that loan." Id. at *8 n.4. Even assuming that the court in Unified Commercial Capital was correct on this point, as noted above, the amount of interest Cullin received was clearly unreasonable.

[10] Even this interpretation is questionable given that Cullin's contracts merely state that she will receive "up to" a certain return without specifying how that return would be calculated or the circumstances under which Agape would be required to remit any interest to Cullin.

10

received any interest from such loans. Thus, the contingencies in Cullin's contracts never occurred and Agape was never obligated to pay Cullin any interest. Accordingly, the Court fails to see how Cullin's contracts gave rise to a valid antecedent debt. Cf. In re Cassandra Grp., 338 B.R. 583, 595–596 (Bankr. S.D.N.Y. 2006) (finding, after bench trial, that payment of $300,000 for release of purported claims constituted fraudulent conveyance because defendants, whose contract with debtor imposed liability on debtor in only limited circumstances that were not triggered, did not have a valid claim against debtor and, thus, the release obtained by debtor did not constitute fair consideration). Moreover, even assuming that Cullin's contracts constitute antecedent debts under the DCL,[11] Agape still did not receive reasonably equivalent value for the 48% annualized interest paid to Cullin given that none of the contract's contingencies ever occurred.

The bankruptcy court's decision in Unified Commercial Capital raises two additional issues, in dicta, with potential relevance to this appeal. Neither of these issues, however, allow Cullin to prevail. In Unified Commercial Capital, the bankruptcy court noted that if "an innocent investor victim receives interest in excess of what a Court determines to be reasonable," the investor would have to return the unreasonable excess, but would still be entitled to retain reasonable interest. 260 B.R. at 351 n.8. Here, however, Cullin has never argued, in the alternative, that she is still entitled to a portion of the $11,744.76 even if her contractual rate of return is found to be unreasonable. Moreover, even if she had raised that argument, she never offered any evidence to establish a reasonable interest rate under the circumstances. In Unified Commercial Capital, the bankruptcy court also stated that even if the contracts at issue were not

---

[11] Under the DCL, "'[d]ebt' includes any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." DCL § 270. However, this definition of "debt" does not answer the question of what constitutes a "fair equivalent" for a contingent liability that was never triggered.

enforceable, the investors still provided value because they loaned money to the debtor for a period of time. Unified Commercial Capital, 260 B.R. at 353. Again, Cullin did not raise any arguments on this point. Additionally, even if Cullin's provision of funds to Agape provided some value, the rate of return that Cullin received was unreasonable and, as explained above, Cullin has never offered any evidence regarding a reasonable interest rate.

Finally, contrary to Cullin's assertion, the Second Circuit's decision in In re Sharp Int'l Corp., 403 F.3d 43 (2d Cir. 2005) does not warrant reversal. In Sharp, the Second Circuit stated that "[a] conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another." Id. at 54 (quoting Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A., 191 A.D.2d 86, 90–91, 599 N.Y.S.2d 816 (1st Dep't 1993)). In Sharp, however, the only question before the court was whether the defendant received the transfer at issue in good faith—it was undisputed that the transfer discharged a valid antecedent debt and was made for a fair equivalent. Id. at 54. Here, for the reasons explained above, Agape did not receive a fair equivalent in exchange for the "interest payments" to Cullin.

### III. CONCLUSION

For the foregoing reasons, the Bankruptcy Court's Order is AFFIRMED.

Dated: March 31, 2015
Central Islip, New York

                                                  /s/ (JMA)
                                                  JOAN M. AZRACK
                                                  UNITED STATES DISTRICT JUDGE